**Michael G. Hanlon**, OSB No. 792550
**LAW OFFICES OF MICHAEL G. HANLON, P.C.**
101 SW Main Street, Suite 825
Portland, OR 97204
Telephone: (503) 228-9787
Facsimile:  (503) 224-4200
Email:      mgh@hanlonlaw.com

**David C. Katz**, (*pro hac vice application forthcoming*)
**Mark. D. Smilow**, (*pro hac vice application forthcoming*)
**Joshua M. Rubin**, (*pro hac vice application forthcoming*)
**WEISSLAW LLP**
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
Email:      dkatz@weisslawllp.com
            msmilow@weisslawllp.com
            jrubin@weisslawllp.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JS HALBERSTAM IRREVOCABLE GRANTOR TRUST, Derivatively on Behalf of PORTLAND GENERAL ELECTRIC COMPANY,<br><br>         Plaintiff,<br><br>  v.<br><br>JACK E. DAVIS, JOHN W. BALLANTINE, RODNEY L. BROWN, JR., KIRBY A. DYESS, MARK B. GANZ, MARIE OH HUBER, KATHRYN J. JACKSON, PH.D., MICHAEL A. LEWIS, MICHAEL H. MILLEGAN, NEIL J. NELSON, M. LEE PELTON, PH.D., MARIA M. POPE, CHARLES W. SHIVERY, JAMES P. TORGERSON, and JAMES LOBDELL,<br><br>         Defendants, | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Page - 1    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
            FIDUCIARY DUTY

– and –

PORTLAND GENERAL ELECTRIC
COMPANY, an Oregon Corporation,

                    Nominal Defendant.

Plaintiff JS Halberstam Irrevocable Grantor Trust ("Plaintiff"), by its attorneys, respectfully submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty against the Defendants named herein.  Plaintiff alleges the following upon personal knowledge with respect to itself, and based upon, *inter alia*, a review of the public filings with the U.S. Securities and Exchange Commission (the "SEC") by Portland General Electric Company ("PGE" or the "Company"), a review of PGE's media releases and reports concerning the Company, securities analysts' reports and advisories about the Company, the litigation captioned *In re Portland General Electric Company Securities Litigation*, No. 3:20-cv-1583-SI (D. Oregon) (the "Securities Class Action"), and an investigation undertaken by Plaintiff's counsel as to all other allegations herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought on behalf of Nominal Defendant PGE to recover from the Company's directors and officers the damages caused to PGE by the misconduct specified herein.

2.      On August 24, 2020, PGE disclosed that, contrary to its assurance to shareholders that "***PGE does not engage in trading activities for non-retail purposes***," it in fact engaged in such speculative and volatile trades on wholesale electricity markets, with "significant exposure to the company," incurring a loss of $127 million  and a 47% cut to its annual earnings projection.

3.     In an email to employees that was filed as part of PGE's disclosures with the SEC, Chief Executive Officer ("CEO") Maria Pope ("Pope") said: "Certain personnel entered into a number of energy trades during 2020, with increasing volume accumulating in the second quarter and into the third quarter, resulting in significant exposure to the company."

4.     The Company further announced that two unnamed employees were placed on administrative leave while its Board of Directors (the "Board") and a phalanx of outside experts undertook a broader review.  As a result of these disclosures, PGE's stock fell 8.4%, near its lowest point for that year.

5.     Until the August disclosure, these high-risk trades had been entirely concealed from shareholders by a series of materially false and misleading statements from the Company's directors and officers.  In those statements, it was represented that PGE engages in low-risk, "***retail*** hedging," designed to "manage risk" and maintain steady retail revenues and profits by protecting against the risks associated with high raw materials price volatility and sudden demand spikes cutting into the Company's profitability.  As to speculative and high-risk "***non-retail*** hedging," the Company's directors and officers caused PGE to represent in in its Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 14, 2020 ("2019 10-K"), and in other public filings with the SEC and reports to shareholders, that "***PGE does not engage in trading activities for non-retail purposes***."[1]  These assurances were highly material to the Company's shareholders because PGE was formerly a part of Enron, which was financially ruined by, among other things, speculative, high-risk energy trading practices.

6.     After revelation of the Company's material losses caused by engaging in previously-concealed non-retail trading, securities class action lawsuits were filed by shareholders

---

[1] Unless otherwise stated, all emphasis is added.

of PGE against the Company and Pope, as well as James Lobdell ("Lobdell"), the Company's then Chief Financial Officer ("CFO") and Treasurer, alleging, among other things, that the defendants misrepresented material facts and/or mislead investors concerning PGE hedging strategies and the Company's lack of appropriate and effective internal controls. As such, the Company has incurred, and will continue to incur, substantial costs defending itself in this lawsuit and may yet face further material liability in resolving the action, whether by settlement or after trial.

7.      On December 18, 2020, the Company represented that a Special Committee formed to investigate the misconduct completed its review and concluded that: (i) the hedging trades were "ill-conceived," resulting from flawed risk management controls; (ii) the Company's Energy Trading Risk Management Unit (which is the arm of the Company entrusted with ensuring that PGE's energy trades remain within the retail purposes risk profile) was being reorganized so that Power Operations would report directly to the Vice President of Strategy, Regulation and Energy Supply, instead of reporting directly to Defendant Pope; (iii) that Defendants Pope and Lobdell were denied their incentive compensation for 2020 (with no further clawback action taken against them); and (iv) that the two individuals in the energy trading division who had been placed on administrative leave in August were terminated from the Company (with no further clawback action taken against them).

8.      The Defendants have at all times owed the Company and its shareholders the highest fiduciary duties to act with candor, loyalty, and in good faith. As part of those fiduciary duties, the Defendants were and are required to ensure that an effective system of internal controls exists so that truthful and complete information is provided to the Company's shareholders and the investing public, to ensure that Company policies are being followed and to ensure that actions

that could create potential liability and harm to the Company are effectively managed and overseen.  These critical fiduciary obligations were breached by the Defendants.

9.        Plaintiff has not made a demand upon the Board to act against those responsible for the Company's damages since it would be futile.  The Defendants' failure to faithfully perform their fiduciary duties by implementing an effective internal control system allowed the misconduct to occur and their failure to ensure that truthful, complete and accurate information was provided to shareholders and the SEC has subjected the Company to material damage.   The Defendants are neither disinterested nor independent, as required to fairly consider a demand, but instead face a substantial likelihood of liability.  As such, demand upon the Company's Board to take the action requested herein would be a futile and wasteful act.

## THE PARTIES

10.        Plaintiff JS Halberstam Irrevocable Grantor Trust holds 2,500 PGE shares that were acquired September 16, 2008 and held continuously since that time.  As such, Plaintiff was a PGE shareholder at the time of the transactions complained of in this derivative complaint.

11.        Defendant Jack E. Davis ("Davis") is Chair of the Company's Board and a director since 2012.  Davis serves on the Company's Nominating and Corporate Governance Committee and the Special Committee.  In 2019, Davis received total compensation of $272,595, including fees earned of $161,750, stock awards of $109,956,  and $889 in other compensation.  He owns 16,534 shares of the Company's unrestricted stock.

12.        Defendant John W. Ballantine ("Ballantine") is a Company director since 2004. Ballantine serves on the  Compensation and Human Resources Committee, the Finance Committee, and the Special Committee.   In 2019, Ballantine received total compensation of

$196,845, including fees earned of $86,000, stock awards of $109,956, and $889 in other compensation.  He owns 25,045 shares of the Company's unrestricted stock.

13.    Defendant Rodney L. Brown, Jr. ("Brown"), is a Company director since 2007.  He serves on the Compensation and Human Resources Committee and on the Finance Committee.  In 2019, Brown received total compensation of $196,845, including fees earned of $86,000, stock awards of $109,956,  and $889 in other compensation.  He owns 24,369 shares of the Company's unrestricted stock.

14.    Defendant Kirby A. Dyess ("Dyess") is a Company director since 2009.  Dyess serves as Chair of the Compensation and Human Resources Committee and is on the Nominating and Corporate Governance Committee.  In 2019, she received total compensation of $209,033, including fees earned of $98,188, stock awards of $109,956, and $889 in other compensation.  She owns 21,411 shares of the Company's unrestricted stock.

15.    Defendant Mark B. Ganz ("Ganz") is a Company director since 2006.  Ganz serves on the Audit Committee and Compensation and Human Resources Committee.  In 2019, Ganz received total compensation of $196,845, including fees earned of $86,000, stock awards of $109,956, and $889 in other compensation.  He owns 25,045 shares of the Company's unrestricted stock.

16.    Defendant Marie Oh Huber ("Huber" ) is a Company director since 2019.  Huber serves on the Compensation and Human Resources Committee and the Finance Committee.  In 2019, Huber received total compensation of $174,492, including fees earned of $64,500 and stock awards of $109,956.  She owns 2,111 shares of the Company's unrestricted stock.

17.    Defendant Kathryn J. Jackson, Ph.D. ("Jackson"), is a Company director since 2014.  Jackson serves on the Compensation and Human Resources Committee, the Finance

Committee, and the Special Committee.  In 2019, Jackson received total compensation of $196,845, including fees earned of $86,000, stock awards of $109,956, and $889 in other compensation.  She owns 13,222 shares of the Company's unrestricted stock.

18.    Defendant Michael A. Lewis ("Lewis") is a Company director since January 1, 2021.  Lewis serves on the Audit Committee and Finance Committee.

19.    Defendant Michael H. Millegan ("Millegan") is a Company director since 2019. He serves on the Audit Committee and Finance Committee.  In 2019, Millegan received total compensation of $221,137, including fees earned of $86,000, stock awards of $134,939, and $198 in other compensation.  He owns 2,723 shares of the Company's unrestricted stock.

20.    Defendant Neil J. Nelson ("Nelson") is a Company director since 2006.  Nelson serves as Chair of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee, and the Special Committee.  In 2019, Nelson received total compensation of $211,845, including fees earned of $101,000, stock awards of $109,956, and $889 in other compensation.  He owns 24,645 shares of the Company's unrestricted stock.

21.    Defendant M. Lee Pelton, Ph.D. ("Pelton") is a Company director since 2006.  He serves as Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.  In 2019, Pelton received total compensation of $208,095, including fees earned of $97,250, stock awards of $109,956, and $889 in other compensation.  He owns 25,045 shares of the Company's unrestricted stock.

22.    Defendant Pope is a Company director since 2018 and has served as President and CEO of the Company since October 1, 2017, and January 1, 2018, respectively.  Pope previously served from March 2013 to October 2017 as Senior Vice President of Power Supply, Operations and Resource Strategy, overseeing PGE's generation plants, energy supply portfolio, and long-

term resource strategy.  Pope joined PGE in 2009 as Senior Vice President of Finance, Chief Financial Officer and Treasurer. She previously served on PGE's Board of Directors from 2006 to 2008.  In 2019, Pope received a base salary of $876,077 and total compensation, including incentive compensation, of $4,065,948.  She owns 40,662 shares of the Company's unrestricted stock.  Pope signed the certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements and adequacy of the Company's controls in the PGE 2019 10-K, the Quarterly Report on Form 10-Q filed by PGE with the SEC on April 24, 2020 for the quarter ended March 31, 2020 (the "1Q20 10-Q"), and the Quarterly Report on Form 10-Q filed by PGE with the SEC on July 31, 2020 for the quarter ended June 30, 2020 (the "2Q20 10-Q").

23.     Defendant Charles W. Shivery ("Shivery") is a Company director since 2014. Shivery serves as Chair of the Finance Committee, a member of the Audit Committee, and on the Special Committee.  In 2019, Shivery received total compensation of $208,095, including fees earned of $97,250, stock awards of $109,956, and $889 in other compensation.  He owns 13,640 shares of the Company's unrestricted stock.

24.     Defendant James P. Torgerson ("Torgerson") is a Company director since January 1, 2021.  He serves on the Compensation and Human Resources Committee, the Finance Committee, and the Special Committee.

25.     Defendant Lobdell was the Company's CFO and Treasurer since March 2013 until his retirement was announced on October 29, 2020.  In 2019, Lobdell received a base salary of $507,892 and total compensation, including incentive compensation, of $1,743,648.  He signed the certifications required by SOX attesting to the accuracy of the financial statements and adequacy of the Company's controls in the 2019 10-K, the 1Q20 10-Q, and the 2Q20 10-Q.

26.     Defendants Davis, Ballantine, Brown, Dyess, Ganz, Huber, Jackson, Lewis, Millegan, Nelson, Pelton, Pope, Shivery, Torgerson, and Lobdell are referred to herein as the Individual Defendants.

27.     Nominal Defendant Portland General Electric Company is an Oregon-based electric utility company headquartered in Portland, Oregon.  PGE provides electricity subject to the Oregon Public Utility Commission ("OPUC") and Federal Energy Regulatory Commission ("FERC") rules and regulations.  PGE is Oregon's largest electric company, serving over 900,000 residential and commercial customers, encompassing the cities of Portland and Salem and several other nearby communities.  PGE's common stock is and was at all relevant times listed on the New York Stock Exchange ("NYSE") under the ticker symbol "POR."

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

29.     Personal jurisdiction exists over each Defendant because PGE is incorporated in Oregon and each of the Individual Defendants is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over that defendant by this Court permissible under traditional notions of fair play and substantial justice.

30.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.    Venue is proper in this District because the Company maintains its principal executive offices in this District.  In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## THE DEFENDANTS' DUTIES

33.    By reason of their positions and because of their ability to control the business and corporate affairs of PGE, the Defendants owe and have owed PGE and its shareholders fiduciary obligations of candor, good faith, loyalty, and due care, and were and are:  required to use their utmost ability to control and manage PGE in a fair, just, and equitable manner; act in furtherance of the best interests of PGE and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders.  In addition, each director of PGE owes and has owed to PGE and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of PGE and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

34.    In addition, the Company maintains a Code of Business Ethics and Conduct for PGE  (the "Code of Conduct"), mandating that each of the Defendants:

- act with the highest levels of honesty, integrity, transparency, and compliance — making the right decisions and taking the right actions every time;

- Earn Trust — We keep our promises and commitments, are honest and straight-forward, deal with issues fairly and consistently, and keep confidences. Through these behaviors we earn the trust of our co-workers and customers;

- While performing work for PGE, we are responsible for putting the company's interests ahead of our own. This means we should never take advantage of business or investment opportunities for ourselves (or for the benefit of friends and family) that we discover through our work at PGE;

- Our business is governed by many state and federal laws, rules, and regulations — too numerous to list in our Code — and we are committed to fully complying with the letter and spirit of all of them;

Page 10 -  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
              FIDUCIARY DUTY

- We are entrusted with company assets and information on a daily basis and are responsible for protecting them and using them appropriately. Generally, company assets should only be used for conducting company business; and

- we are all responsible for maintaining company books, records, accounts, financial statements, and other business records accurately, in reasonable detail, and in compliance with PGE policies. Business records include such things as expense reports, timesheets, medical forms, and logs. Company records need to be accurate, complete and appropriately reflect all transactions. If we know of any instance where company records have been falsified, we should report it promptly to Ethics & Compliance.

35.    In addition, the Company maintains a Code of Ethics for the Chief Executive and

Senior Financial Officers mandating that they:

- conduct business in accordance with applicable laws, rules and regulations and the highest ethical standards of business conduct, and to full and accurate financial disclosure in compliance with applicable law;

- Senior Financial Officers are required to conduct themselves honestly, ethically and with absolute integrity with respect to the Company's business, including accounting and financial reporting for the Company and, when acting at the request of the Company on behalf of another entity or enterprise to which the Senior Financial Officer owes a fiduciary obligation, with respect to accounting and financial reporting for that entity or enterprise. In addition, the leadership responsibilities of the Company's Senior Financial Officers include creating a culture of ethical business conduct and commitment to compliance, maintaining a work environment that encourages employees to raise concerns, and promptly addressing those concerns;

- Senior Financial Officers are required to comply, and to cause the Company to comply, with the laws, rules and regulations that govern the conduct of the Company's business and to report any suspected violations in accordance with the section below entitled "Reporting of Violations";

- A conflict of interest occurs when the private interests of a Senior Financial Officer interfere in any way, or even appear to interfere, with the interests of the Company. The obligation of Senior Financial Officers to conduct the Company's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest;

- It is Company policy to make full, fair, accurate, timely and understandable disclosures in compliance with all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company. Senior Financial Officers are required to promote compliance by all employees with this

policy and to abide by Company standards, policies and procedures designed to promote compliance with this policy.

36.    Furthermore, the Company maintains Corporate Governance Guidelines which mandate that the Company's Directors:

- spend the time and effort necessary to properly discharge his or her responsibilities

- build long-term value for the Company's shareholders; and

- monitor both the performance of the Company (in relation to its goals, strategy and competitors) and the performance of the Chief Executive Officer.

37.    Defendants Nelson (Chair), Ganz, Millegan, Pelton, and Shivery are members of the Company's Audit Committee of the Board.  Pursuant to its Charter, the purpose of the Audit Committee is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing and financial reporting functions of the Company and its subsidiaries, as well as matters involving the internal controls, including, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements that are material to the Company, (iii) the Company's independent auditors' qualifications and independence, and (iv) the performance of the Company's independent auditors and the Company's internal audit function, (b) preparing the report required to be prepared by the Committee pursuant to the rules of the SEC for inclusion in the Company's annual proxy statement and (c) assisting the Board in overseeing the Company's guidelines and policies with respect to risk assessment and risk management.

38.    The Audit Committee is required to, among other things: review the adequacy and effectiveness of the Company's material accounting and internal control policies and procedures on a regular basis; discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company, including the internal

auditing department, assess and manage the Company's exposure to financial risk, discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, and assist the Board in its oversight of the Company's guidelines and policies governing the process by which senior management and other relevant departments of the Company assess and manage the Company's exposure to other risks; review with management (i) the process for evaluating the Company's material internal controls and (ii) the results of evaluations of such internal controls by management, the internal auditors and the external auditors, including any special audit steps adopted in light of the discovery of material control deficiencies.

39.    The Audit Committee Charter further requires that its members, among other things:

- Meet periodically with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters that are material to the Company, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company;

- Oversee the development and implementation of the Company's ethics and compliance program; and

- Assist the Board with the oversight of the Company's risk management program.

40.    Defendants Dyess (Chair), Ballantine, Brown, Ganz, Huber, and Jackson) are members of the Compensation and Human Resource Committee of the Board.  Pursuant to its Charter, the purposes of the Compensation and Human Resources Committee are to oversee the compensation of the Company's executive officers, including the Company's incentive-compensation and equity-based plans applicable to executive officers.

41.    The Charter of the Compensation and Human Resource Committee further mandates that they, among other things:

- Evaluate the performance of the CEO and makes a recommendation regarding her compensation to the independent directors

- Approve the compensation of the executive officers other than the CEO;

- Review the Company's non-management director compensation program and recommends appropriate levels of compensation for non-management directors to the Board;

- Together with the other independent directors, oversee the Company's incentive compensation clawback policy and recovery of performance-based compensation awards; and

- Review and approve severance or termination payment arrangements for executive officers.

42.     Defendants Shivery (Chair), Ballantine, Brown, Huber, Jackson, and Millegan are members of the Finance Committee of the Board.  Pursuant to its Charter, the purpose of the Finance Committee is to aid the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the financial plans, activities and results of the Company and its subsidiaries. Such assistance includes, without limitation, (a) assisting the Board's oversight of (i) long-term and short-term financial and investment objectives, strategies and plans, including capital structure, budgets and forecasts; (ii) financial risk and the measures to reduce such risk; (iii) dividends; (iv) investment policies and investment performance of the Company's benefit plans; (b) approving certain financial transactions; and (c) performing any other activities as the Board may, from time to time, deem necessary or appropriate.

43.     The Finance Committee members were and are required to comply with the Charter of the Finance Committee, which, among other things, provides:

- Subject to any limits set by the Board, approve the terms of, and take or authorize all necessary actions to effect, the use of hedges, interest rate swaps and other derivative contracts to mitigate interest rate risk and other financial risks with respect to First Mortgage Bonds, pollution control and industrial development bonds, and other debt whether outstanding or in connection with the issuance of any thereof;

- Assist the Board in overseeing the management of risks associated with the Company's power operations, capital projects, finance activities, credit and liquidity; and

- Review and recommend to the Board investment policies and guidelines.

44.     The Defendants, because of their positions of control and authority as executive officers and/or directors of PGE were able to and did, directly and indirectly, control the matters and transactions complained of herein.   These Defendants have and had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

45.     Each of the Defendants, both individually and in concert with the other Defendants, breached their fiduciary duties as described herein.

**SUBSTANTIVE ALLEGATIONS**

46.     PGE engages in non-speculative, low-risk energy futures trading, *i.e.*, "hedging," to protect against the risks associated with high raw materials price volatility and sudden demand spikes cutting into the Company's profitability.   Such trading is known as "retail purposes" hedging, which PGE repeatedly represented in its public filings and statements is a critical part of the Company's strategy to maintain steady retail revenues and profits, making the Company an attractive investment for shareholders desiring steady returns on a relatively low-risk investment.

47.     These representations were critical to PGE's investors because avoiding the substantial financial risks of speculative energy trading ensured that the Company would not

engage in the same risky practices that brought down Enron, PGE's predecessor company, in what was arguably the 20th century's biggest corporate meltdown.

48.    In the 2019 10-K, the Defendants caused PGE to represent that the Company engages in retail purposes hedging: (i) "to balance its supply of power to meet the needs of its retail customers"; (ii) "to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts"; and (iii) "to balance its supply of power to meet the needs of its retail customers."  Specifically, it is represented in the 2019 10-K that:

> ***PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers***. … Wholesale revenues represented 8% of total revenues in 2019 and 2018, and 5% in 2017.  PGE utilizes its generating resources, as well as wholesale power purchases from third parties to meet the needs of its retail customers.  The volume of electricity the Company generates is dependent upon, among other factors, the capacity and availability of its generating resources and the price and availability of wholesale power and natural gas.  As part of its power supply operations, the Company enters into short- and long-term power and fuel purchase agreements.  ***PGE executes economic dispatch decisions concerning its own generation and participates in the wholesale market in an effort to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts***.  The Company also promotes energy efficiency measures to meet its energy requirements.
>
> \* \* \*
>
> ***Results from sales of electricity to utilities and power marketers made in the Company's efforts to secure reasonably priced power for its retail customers, manage risk, and administer its current long-term wholesale contracts***.  Such sales can vary significantly from year to year as a result of economic conditions, power and fuel prices, hydro and wind availability, and customer demand. In 2019, an $11 million, or 7%, increase in wholesale revenues over 2018 resulted from $14 million related to a 9% increase in wholesale sales volume partially offset by $3 million from a 1% decrease in average prices received when the Company sold power into the wholesale market.  ***PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers***.

49.    The Defendants further caused PGE to state in the 2019 10-K that the Company's hedging activities were designed to manage price risk exposure due to the volatility of power costs, but in a way that manages price fluctuations without engaging in trading for "non-retail purposes":

Page 16 - VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
        FIDUCIARY DUTY

PGE is exposed to commodity price risk, as its primary business is to provide electricity to its retail customers. ***The Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers.*** The Company uses power purchase contracts to supplement its own generation and to respond to fluctuations in the demand for electricity and variability in generating plant operations. The Company also enters into contracts for the purchase of fuel for the Company's natural gas- and coal-fired generating plants. These contracts for the purchase of power and fuel expose the Company to market risk. The Company uses instruments such as: i) forward contracts, which may involve physical delivery of an energy commodity; ii) financial swap and futures agreements, which may require payments to, or receipt of payments from, counterparties based on the differential between a fixed and variable price for the commodity; and iii) option contracts to mitigate risk that arises from market fluctuations of commodity prices. ***PGE does not engage in trading activities for non-retail purposes.***

\* \* \*

PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk in order to manage volatility in NVPC for its retail customers. Such derivative instruments, recorded at fair value on the consolidated balance sheets, may include forward, futures, swap, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the consolidated statements of income. In accordance with ratemaking and cost recovery processes authorized by the OPUC, the Company recognizes a regulatory asset or liability to defer the gains and losses from derivative activity until settlement of the associated derivative instrument. PGE may designate certain derivative instruments as cash flow hedges or may use derivative instruments as economic hedges. ***The Company does not engage in trading activities for non-retail purposes.***

50.    The Defendants also caused PGE to represent in the 2019 10-K that, pursuant to a regulatory mandated procedure of evaluation undertaken by the Company's CEO and CFO, the Company's *disclosure controls and procedures and its internal controls over financial reporting are effective*:

Management of the Company, under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report pursuant to Rule 13a-15(b) under the Exchange Act. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective.***

* * *

Management of the Company, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's internal control over financial reporting as of the end of the period covered by this report pursuant to Rule 13a-15(c) under the Exchange Act. Management's assessment was based on the framework established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that, as of December 31, 2019, ***the Company's internal control over financial reporting is effective.***

51.     Defendants Pope and Lobdell signed the certifications required by SOX attesting to the accuracy of the financial statements and adequacy of the Company's controls in the 2019 10-K.

52.     On March 12, 2020, PGE filed its Schedule 14A with the SEC and disseminated its notice of annual shareholder meeting and proxy statement (the "2020 Proxy"), which was signed by Defendants Pope and Davis.  Among other things, the 2020 Proxy solicited shareholder votes for the election of Davis, Ballantine, Brown, Dyess, Ganz, Huber, Jackson, Millegan, Nelson, Pelton, Pope, and Shivery to the Company's Board, and sought shareholder approval of the compensation plan for the Company's executives.

53.     Regarding the re-election of directors, the 2020 Proxy represented that:

- The Board takes an active role in assisting management with the development of the Company's long-term business strategy;

- Throughout the year, our management team regularly reports to the Board on the execution of our long-term strategic plans, the status of important projects and initiatives, and the key opportunities and risks facing the Company;

- Identifying and managing material risks facing the Company is a core responsibility of our Board, the committees of the Board, and our senior management; and

- The Board of Directors is responsible for assessing whether management has put in place effective systems to identify, evaluate, and manage the material risks facing the Company.  The Board satisfies its oversight function through reporting from management on areas of material risk, including strategic, operational, cybersecurity, environmental, financial, legal, and regulatory risks.  In addition,

management reports each quarter to the Audit Committee on activities and findings of the Company's risk management program.

54.    Regarding the compensation plan, the 2020 Proxy represented:

- Robust Governance Policies.  Policies are in place to mitigate compensation risk such as ownership guidelines, insider-trading prohibitions, and compensation clawbacks;

- In 2017, our Board of Directors adopted a compensation clawback policy that allows the independent directors, acting as a group, to cancel unvested incentive compensation and recover previously paid incentive compensation in the event a current or former executive officer engages in misconduct that contributes to the need for a material restatement of our financial results;

- In February 2019, the board amended and restated our clawback policy to permit the Company also to recover compensation based on a current or former executive officer's egregious misconduct that causes significant reputational or financial harm to the Company;

- In the event of such misconduct the independent directors are authorized to cancel all unvested incentive compensation awards and require the return of compensation earned during the one-year period preceding the Company's discovery of the misconduct; and

- In determining the amount of compensation to recover under the policy, the independent directors may take into account any considerations they deem appropriate, including events that led to a financial restatement, the conduct of the executive, the impact of the misconduct, the cost of the recovery process, and the likelihood of successful recovery under governing law.

55.    With regard to the Company's solicitation of shareholder approval for executive compensation, the 2020 Proxy represented that "our executive compensation programs are designed to attract and retain highly qualified executive officers and to provide them with incentives to advance the interests of our stakeholders, which include our customers, our shareholders, our employees, and the communities we serve."

56.    The 2020 Proxy contained materially false and misleading statements and omitted material information.  In particular, the 2020 Proxy failed to disclose that PGE engaged in significant, speculative and high-risk non-retail hedge trading and that its engaging in such non-

retail hedging exposed the Company to significant liabilities.  Further, it was misrepresented in the 2020 Proxy that the Company's controls and policies were adequate, despite the fact that it was engaging in trading activities that the Defendants caused the Company to expressly disclaim in the 2019 10-K.  Had proper disclosure been made in the 2020 Proxy, the Director Defendants would not have been re-elected directors nor would shareholders have approved the compensation policies put forward.

57.     On April 24, 2020, PGE filed with the SEC its 1Q20 10-Q.  In the 1Q20 10-Q, Defendants caused PGE to represent again that PGE's hedging activities for energy are: (i) "*to balance its supply of power to meet the needs of its retail customers*"; (ii) "*to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts*"; and (iii) "*to balance its supply of power to meet the needs of its retail customers,*" adding further that these trading activities were not for "non-retail purposes":

> PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers. … PGE's Wholesale revenues are primarily short-term electricity sales to utilities and power marketers that consist of single performance obligations that are satisfied as energy is transferred to the counterparty…
>
> ***Price Risk Management: PGE participates in the wholesale marketplace to balance its supply of power, which consists of its own generation combined with wholesale market transactions, to meet the needs of its retail customers, manage risk, and administer its existing long-term wholesale contracts***….  PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk to reduce volatility in NVPC [net variable power costs] for its retail customers.  Such derivative instruments, recorded at fair value on the condensed consolidated balance sheets, may include forward, futures, swaps, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the condensed consolidated statements of income and comprehensive income….
>
> ***The Company does not engage in trading activities for non-retail purposes***.  The Company participates in wholesale markets by purchasing and selling electricity and natural gas in an effort to meet the needs of, and obtain reasonably-priced power for, its retail customers.  ***The Company generates revenues and cash flows***

*primarily from the sale and distribution of electricity to retail customers in its service territory.*

58.     Attached to the 1Q20 10-Q were SOX certifications signed by Defendants Pope and Lobdell attesting to the accuracy of the financial statements and adequacy of the Company's controls contained therein.

59.     Also, on April 24, 2020, PGE filed with the SEC Current Reports on Forms 8-K and 8-K/A with an appended press release entitled "Portland General Electric announces first quarter 2020 results." This press release represented the Company's downward revision of its full-year earnings guidance predicated largely upon the deteriorating economic outlook resulting from the onset of the COVID-19 pandemic, but otherwise did not reflect any material change to revenue or earnings from non-retail energy trading. It states in relevant part:

> Our financial performance this quarter largely reflects conditions experienced prior to the COVID-19 pandemic," said Maria Pope, PGE president and CEO. "PGE is committed to serving the needs of our customers and our community during this time. Given the deteriorating economic outlook, the company is revising full-year earnings guidance to $2.20 to $2.50 per diluted share. This guidance includes a decrease in annual retail deliveries of 1 to 2%, weather adjusted, and reflects management actions to reduce operating and maintenance and capital spending. Our forecasts of long-term earnings growth remain at 4 to 6%.

> Total revenues showed no change as increases in retail revenues and wholesale revenues were offset by a decrease in other operating revenues. Lower purchased power and fuel expense resulted from a lower power cost per MWh primarily due to strong wind production. In addition, lower operating expenses were driven by reduced plant maintenance expense, which was partially offset by increased distribution expense. Earnings were also impacted by a decline in the market value of the non-qualified benefit trust and higher depreciation and amortization as the result of capital additions.

60.     Later that same day, PGE held a conference call with financial analysts. On the call, Defendant Pope assured investors that the Company was continuing to lower costs and that its long-term strategy remained unchanged:

> **I would also add that our long-term strategy has not changed.** In fact, early discussions and findings that we see is that our customers in the state of Oregon are

as focused on decarbonizing our energy supply today as they were before the pandemic. We continue to see interest in electrification of sectors and an overall focus on continuing to build out a smart and integrated grid…. So we really see through this period of time the ability to, in many ways, accelerate the transformation from a technological standpoint and to emerge stronger and lower cost after the pandemic.

61.    On July 31, 2020, PGE filed with the SEC its 2Q20 10-Q. In the 2Q20 10-Q,

Defendants caused PGE to represent again that PGE's hedging activities for energy are employed:

(i) "*to balance its supply of power to meet the needs of its retail customers*"; (ii) "*to obtain*

*reasonably-priced power for its retail customers, manage risk, and administer its long-term*

*wholesale contracts*"; and (iii) "*to balance its supply of power to meet the needs of its retail*

*customers,*" adding further that these trading activities were not for "non-retail purposes":

> PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers. … PGE's Wholesale revenues are primarily short-term electricity sales to utilities and power marketers that consist of single performance obligations that are satisfied as energy is transferred to the counterparty…
>
> ***Price Risk Management: PGE participates in the wholesale marketplace to balance its supply of power, which consists of its own generation combined with wholesale market transactions, to meet the needs of its retail customers, manage risk, and administer its existing long-term wholesale contracts***…. PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk to reduce volatility in NVPC [net variable power costs] for its retail customers. Such derivative instruments, recorded at fair value on the condensed consolidated balance sheets, may include forward, futures, swaps, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the condensed consolidated statements of income and comprehensive income….
>
> ***The Company does not engage in trading activities for non-retail purposes***. The Company participates in wholesale markets by purchasing and selling electricity and natural gas in an effort to meet the needs of, and obtain reasonably-priced power for, its retail customers. ***The Company generates revenues and cash flows primarily from the sale and distribution of electricity to retail customers in its service territory.***

62.    On the same day, PGE filed with the SEC a Current Report on Form 8-K with an

appended press release entitled "Portland General Electric announces second quarter 2020 results,"

reporting that the Company achieved solid financial results in its second quarter, but omitting any reference to non-retail trading:

> "We achieved solid second quarter financial results, driven by a combination of favorable hydro and wind conditions and lower operating expenses," said Maria Pope, PGE president and CEO. "As an essential service provider, we will continue working to keep costs low to support economic recovery and the communities we serve in this unprecedented time."
>
> ***Total revenues increased as a result of higher residential, industrial and wholesale demand, which was partially offset by lower commercial demand.*** Power costs increased due to higher overall system deliveries, which more than offset a decline in the average cost per MWh due to lower gas prices and surplus hydro in the region. Operating expense declined due to continuous efforts to reduce the company's overall cost structure as well as lower plant maintenance expense.

63.    On August 24, 2020, PGE issued a press release and filed with the SEC a Current Report on Form 8-K appending that press release, in which it was disclosed that the Company would take a $127 million loss associated with "a number of energy trades during 2020, with increasing volume accumulating late in the second quarter and into the third quarter, resulting in significant exposure to the Company."  The Company further represented that "[i]n August 2020, this portion of PGE's energy portfolio experienced ***significant losses*** as wholesale energy prices increased substantially at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West" (emphasis added).  As a result of this material loss, PGE was slashing its previous full-year 2020 guidance of $2.20 to $2.50 per diluted share to $1.30 to $1.60 per diluted share, a massive reduction of about 46%.

64.    Furthermore, PGE disclosed the formation of a Special Committee comprised of Defendants Ballantine, Davis (Chair), Jackson, Nelson and Shivery to investigate the energy trades, the retention of Simpson Thacher & Bartlett LLP as an independent legal advisor for the Special Committee, and retention of Skadden, Arps, Slate, Meagher & Flom LLP as a legal advisor and J.P. Morgan Securities LLC as a financial advisor for the Company.  PGE disclosed further

the retention of an "external consultant to perform a full operational review of the Company's energy supply risk management policies, procedures and personnel." Further, PGE disclosed that two individuals were placed on "administrative leave."

65. The disclosures sent PGE's stock price spiraling downward by 8.4%.

66. On August 24, 2020, Wells Fargo, a financial services company, issued a report regarding PGE's disclosures, noting that "[w]hile large swings in power costs would typically be subject to recovery via the PCAM, POR *is not seeking regulatory recovery as it appears that the positions taken were imprudent*" (emphasis added). It further noted that "the development calls into question the company's internal controls and incentives and represents a black mark on the track record. Further, we wonder if this could lead to increased scrutiny on the company's power procurement and hedging strategies by the OPUC."

67. Morningstar, a financial services firm, stated in its August 25, 2020 report, "*Portland General Trading Losses Come as Shocker*," that "[w]e think investors should be most concerned about the size of the loss, which is about one quarter of PGE's typical annual purchased power costs. We believe shareholders are best off if PGE is exceptionally conservative with power costs since Oregon requires shareholders to pay for the bulk of power costs when they are unusually high."

68. According to Morningstar, PGE represented in its Form 10-K that "[p]hysically settled electricity and natural gas sale and purchase transactions are recorded in Revenues, net and purchased power and fuel expense, respectively, upon settlement, while transactions that are not physically settled (financial transactions) are recorded on a net basis in purchased fuel expense upon financial settlement." Thus, Morningstar stated that a loss representing 25% of PGE's purchased power expenses is *highly significant and unusual*.

69.     On September 10, 2020, CFRA, a Wall Street research firm founded as the "Center for Financial Research and Analysis" in 1994, which previously characterized PGE as a "low" risk investment in each of its prior reports, changed its risk assessment to "medium," attributing the change to "the recently highlighted exposure [of the Company] to wholesale energy markets." CFRA added that there could be "some possible reputational risks that could stem from recent energy trading losses experienced by the company" and expressed concern "over the company's governance and risk controls."

70.     On October 29, 2020, Defendant Lobdell announced his retirement.  The Company has not sought to terminate him for cause nor to clawback any of his compensation.

71.     On November 2, 2020, CFRA stated that the loss experienced by PGE was "highly unusual for a regulated electric utility company."  The report further stated that concerns regarding PGE's lack of adequate risk controls and governance were heightened by the Company's involvement in the 2001 energy crisis when it was owned by Enron.

72.     On December 18, 2020, PGE announced that the Special Committee concluded its review "of the energy trading activity that led to the losses incurred in the third quarter." According to the press release, the Special Committee concluded:

> [T]he trades were ill-conceived and revealed opportunities for improving the Company's energy trading policies and practices.  Additionally, the Board of Directors concluded that the actions the Company began taking in August to enhance oversight of energy trading and associated risk management reporting, policies and practices are consistent with the Special Committee's recommendations and will be monitored by the Board of Directors through enhanced reporting.  These actions will strengthen the Company and include:
>
> - **Added expertise:**  PGE brought in additional experienced risk management personnel and replaced the Power Operations general manager with a new interim leader.
>
> - **Strengthened trading policies:**  Power Operations personnel are operating under revised policies designed to prevent positions of the type that led to the losses.  The improved policies place controls on the ability of personnel to enter into wholesale

energy transactions to the extent that PGE does not have physical or financial delivery capability.

- **Enhanced risk reporting:**  Energy trading activity reporting has been improved to ensure greater visibility into portfolio risk.

- **Changed reporting structures:** Energy Trading Risk Management now reports through a Risk and Compliance team that reports to the Chief Executive Officer. Effective January 1, 2021, Power Operations will report to the Vice President of Strategy, Regulation and Energy Supply.

- **Changed personnel:**  The individuals who previously were placed on leave are no longer with the Company.

73.    Further, the Company reported that the Compensation and Human Resources Committee of the Board of Directors determined that, "in  light of the third quarter losses, it would be inconsistent with PGE's pay-for-performance philosophy for certain senior leaders to receive annual incentive compensation.  Accordingly, the CEO, the CFO and one additional executive officer will not receive any annual incentive compensation for 2020."

74.    The Special Committee further disclosed:

energy trading positions resulting in these losses were short in the desert Southwest and California power markets and long in the Pacific Northwest power markets.  In August 2020, wholesale electricity prices increased substantially in the desert Southwest and California power markets due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West.  As a result of these market disruptions and the Company's exposure to these positions, the Company's energy portfolio realized significant losses.

75.    Contrary to the frequently repeated representation that PGE did not engage in non-retail trading that the Defendants caused the Company to make in numerous SEC filings, PGE had engaged in just such activities.

76.    As a result of the disclosure of the materially false and misleading nature of these repeated representations, a class of investors who purchased PGE stock between February 13, 2020 and August 24, 2020 is pressing fraud claims against the Company, Pope, and Lobdell in the Securities Class Action, captioned *In re Portland General Electric Company Securities Litigation*,

No. 3:20-cv-1583-SI (D. Oregon).  The plaintiffs bring claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, as well as Section 20(a) of the Exchange Act.

## LACK OF INTERNAL CONTROLS

77.    A company's internal controls are supposed to provide reasonable assurances of reliability to ensure that an effective system of internal controls and supervision exists over the Company's preparation and dissemination of its public statements and the Company's representations of its actual operations, and that corporate governance practices and procedures are sufficient, so that the Company's public statements and representations of actual operations are accurate and truthful.  Furthermore, a company's internal controls over hedging strategies include those policies and procedures that: (1) pertain to the maintenance of rules and procedures that, in reasonable detail, accurately and fairly portray the scope and protocol of permissible and impermissible hedging activities; (2) provides reasonable assurance that hedging transactions are effected consistent with the rules and procedures and only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized hedging activity, use, or disposition of the company's assets that could have a material effect on the financial statements.

78.    According to the Defendants' admissions detailed in the August 24, 2020, disclosure, PGE recognized a $127 million loss associated with "a number of energy trades during 2020, with increasing volume accumulating late in the second quarter and into the third quarter, resulting in significant exposure to the Company."  The Company further explained that "[i]n August 2020, this portion of PGE's energy portfolio experienced significant losses as wholesale

energy prices increased substantially at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West."

79.     The Company further admitted on December 18, 2020, that the hedging trades were ill-conceived and reflected inadequate energy trading policies and practices.  These admissions belie the presence of adequate internal controls capable of ensuring that the Company's preparation and dissemination of its public statements and the Company's representations of its actual operations are accurate and truthful.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff brings this complaint derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as a direct result of the violations of fiduciary duties by the Individual Defendants.

81.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

82.     Plaintiff purchased the Company's stock prior to the time of the alleged wrongdoings and has held the Company stock continuously since that time.

83.     Plaintiff did not make a demand on the PGE Board to institute this action since such demand would have been a futile, wasteful and useless act.  The wrongful acts complained of show an abdication by the Individual Defendants of their fiduciary duties of candor, good faith, loyalty, due care, and oversight.  As discussed below, a majority of the current directors have personal conflicts of interest or have demonstrated their individual inability to act independently and impartially.

84.     Defendants Davis, Ballantine, Brown, Dyess, Ganz, Huber, Jackson, Lewis, Millegan, Nelson, Pelton, Pope, Shivery, and Torgerson (the "Director Defendants"), as directors

of the Company, were required to implement and maintain an effective system of internal controls for the Company.  In violation of that duty, the Director Defendants failed to implement internal controls over the Company's financial reporting, and its trading operations.  The Company was materially damaged by the Director Defendants' breaches of their fiduciary duties.

85.    The Company's Board is unable to make an impartial decision as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or their failure to ensure the Company's implementation and maintenance of an adequate system of internal controls and corporate governance practices and procedures, and are neither disinterested nor independent.

86.    The Director Defendants face a substantial likelihood of liability for the misconduct pled in this derivative action.  The Director Defendants have and had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate and complete, which they failed to do.

87.    Further, the Director Defendants were faced with red flags that required that they investigate and act.  PGE was spun-off from Enron to become an independent company as part of the Enron bankruptcy, which was caused, in part, by risky hedge trading.  The continued use of hedge trading by PGE required that the Director Defendants exercise vigilance to ensure that no risky, non-retail trading was occurring at PGE.  Had the Director Defendants acted in accordance with their fiduciary duties, the loss caused to PGE by the misconduct discussed herein could have been avoided, or at least minimized.

88.     The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.   No person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.   Indeed, the Director Defendants have the ability to cancel unvested incentive compensation awards and require the return of compensation earned during the one-year period preceding the Company's discovery of the misconduct alleged, but have failed to do so.

89.     If the Director Defendants were to bring a suit on behalf of the Company to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This is something they will not do.   For this reason, demand is futile.

### A.      Demand is Futile as to the Audit Committee Defendants

90.     The Charter of the Audit Committee sets out the responsibilities of the Audit Committee.   Pursuant to the Charter, the Audit Committee Defendants (Nelson (Chair), Ganz, Millegan, Pelton, Shivery) were responsible for, among other things, the implementation and maintenance of internal controls over financial reporting and legal compliance.

91.     The Audit Committee Defendants failed in fulfilling these specific duties. Accordingly, the Audit Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.   Any demand upon the Audit Committee Defendants therefore is futile.

### B.      Demand is Futile as to the Compensation Committee Defendants

92.     Pursuant to the Company's Charter of the Compensation and Human Resource Committee, the Compensation and Human Resource Committee Defendants (Defendants Dyess (Chair), Ballantine, Brown, Ganz, Huber, and Jackson), were required to, among other things,

ensure that compensation to officers reflected the benefit conferred by their service upon the Company.

93.    Despite these duties, the Compensation and Human Resource Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing, the administration of the executive compensation program and the impact of hedge trading effects thereon.  In addition, the Compensation Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and enforcing the incentive compensation clawback policy, recovering performance-based compensation awards; and approving severance or termination payment arrangements for executive officers.  Accordingly, the Compensation Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Compensation Committee Defendants therefore is futile.

### C.    Demand is Futile as to the Finance Committee Defendants

94.    Defendants Shivery (Chair), Ballantine, Brown, Huber, Jackson, and Millegan are members of the Finance Committee of the Board.  Pursuant to its Charter, the purposes of the Finance Committee is to, among other things, provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the financial plans, activities and results of the Company and its subsidiaries, including, but not limited to, long-term and short-term financial and investment objectives, strategies and plans, including capital structure, budgets and forecasts and financial risk and the measures to reduce such risk.  Indeed, the Finance Committee is specifically tasked with oversight over hedge trading.  The Finance Committee Defendants utterly failed to perform their required role and, as such, face a substantial likelihood of liability for the misconduct described herein.

**D.      Demand is Futile as to Defendant Pope**

95.      Demand is futile as to Defendant Pope.  The 2020 Proxy represents that Defendant Pope is not independent as defined under the rules of NYSE.  She is the CEO of the Company, a full-time employee whose livelihood depends on her executive position at the Company.

96.      In addition, Pope is not able to disinterestedly consider a demand to bring suit against her because she is named as a defendant in the Securities Class Action which alleges that she made false and misleading statements in violation of the federal securities laws.  Pope is directly interested and cannot fairly consider a demand that the Company take action to recover its damages.

**E.      Demand is Futile as to Defendants Pope and Davis**

97.      Defendants Pope and Davis face a substantial likelihood of liability as a result of their signing the false and misleading 2020 Proxy.  As makers of the statements in the 2020 Proxy, their own conduct is directly at issue and they are directly responsible for the false and misleading statements contained therein.  Since Pope and Davis are directly interested, they cannot fairly consider a demand that the Company take action to recover its damages.

**F.      Demand is Futile as to Davis, Shivery and Torgerson**

98.      Demand is futile as to Defendants Davis, Shivery and Torgerson.  They have longstanding, overlapping relationships as current or former directors on the board of the Edison Electric Institute ("EEI"), an association that represents all U.S. investor-owned electric companies, on which Davis (former director), Shivery (former director) and Torgerson (since 2006, and on its executive committee since 2013) served.  As such, they would not initiate suit against each other to recover the Company's damages.

### G.    Demand is Futile as to Defendants Jackson and Torgerson

99.    Demand is futile as to Defendants Jackson and Torgerson.  They hold two of the three director chairs of Rice Acquisition Corp., and, as such, are well-acquainted with each other and would not bring suit against each other to recover the Company's damages.

### H.    Demand is Futile as to the Director Defendants for Additional Reasons

100.    The Company's Board has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite Defendants' wrongdoing, the Board has failed to take action to cause them to remunerate the Company for its damages.

101.    Each of the Director Defendants received stock option awards to purchase thousands of shares of common stock merely for being appointed to the Board, as more fully set forth above.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on the Company.  Thus, demand on each of the Director Defendants is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive or will receive for continuing to serve as directors on the Company's Board.

102.    Upon information and belief, the Company has purchased Directors & Officers Liability Insurance ("D&O Insurance"), which typically contains a provision known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of the Company, the Company's insurer could disclaim coverage.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage

could not be disclaimed on this basis and will provide a source for the Company to effectuate recovery.

## COUNT I

**Violations of**
**Section 14(a) of the Securities Exchange Act of 1934**

103.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

105.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

106.    The 2020 Proxy failed to disclose that PGE engaged in non-retail hedge trading and that its engaging in such non-retail hedging exposed the Company to significant liabilities. Further, it was misrepresented in the 2020 Proxy that the Company's controls and policies were adequate despite the fact that it was engaging in trading activities that the Director Defendants

caused the Company to expressly disclaim in the 2019 10-K.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

107.    Moreover, the Proxy Statement was materially false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Director Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact.

108.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy were materially false and misleading.  The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2020 Proxy, including but not limited to, election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

109.    The materially false and misleading elements of the 2020 Proxy led to the re-election of Davis, Ballantine, Brown, Dyess, Ganz, Huber, Jackson, Millegan, Nelson, Pelton, Pope, Shivery, which allowed them to continue breaching their fiduciary duties to PGE.

110.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2020 Proxy.

111.    Plaintiff on behalf of PGE has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

113.    Each Individual Defendant owed the Company and its shareholders the highest duties of loyalty, honesty, candor, good faith and care.

Page 35 -  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
            FIDUCIARY DUTY

114.     At a minimum, to discharge these duties, each Individual Defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls, procedures, statements and financial affairs of the Company.  By virtue of these obligations, each Individual Defendant was required to, *inter alia*:

> a.   exercise reasonable control and supervision over the officers, employees, agents, business, and operations of the Company;
>
> b.   be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable, or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts;
>
> c.   oversee the Company's operations and ensure that risky practices were not occurring; and
>
> d.   to conduct the affairs of the Company to provide the highest quality services and maximize the profitability of the Company for the benefit of its shareholders.

115.     The Individual Defendants each owed a duty to the Company to implement and maintain internal control systems and corporate governance procedures to ensure that they were functioning in an effective manner and in compliance with federal and state statutes and regulations, including but not limited to SOX.

116.     Independent of SOX, the Individual Defendants should be required to remunerate the Company for its damages and disgorge any and all gains unjustly obtained at the expense of the Company and its shareholders by way of their breach of their fiduciary duties.

117.     Accordingly, Plaintiff seeks on behalf of the Company monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT III

## Waste of Corporate Assets

118.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

119.    The Individual Defendants knowingly, intentionally, recklessly, or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

120.    The Individual Defendants have bestowed upon themselves grossly excessive compensation that has no reasonable or legitimate basis, especially due to their woeful leadership, control and supervision over the Company, management, policies, practices, controls, and financial affairs which has caused substantial damage to the Company and its shareholders.

## COUNT IV

### Contribution and Indemnification

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

122.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

123.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions.  Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT V

### Derivatively for Aiding and Abetting

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their fiduciary duties to the Company and have participated in such breaches of fiduciary duties.

126.    In committing the wrongful acts alleged herein, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

127.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including breaches of fiduciary duty.

128.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

129.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## COUNT VI

### Derivatively for Gross Mismanagement

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

132.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith, due care, loyalty, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

133.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that the Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative;

B.    Declaring that the Director Defendants have violated the federal securities laws as alleged herein;

C.    Declaring that the Individual Defendants have breached their fiduciary, common law and civil law duties and participated and/or aided and abetted the breach of their fiduciary duties as alleged herein;

D.    Declaring that the Individual Defendants have aided and abetted each other in their breaches of fiduciary duty;

E.      Directing the Individual Defendants, jointly and severally, to account for all losses and/or damages sustained by the Company by reason of the acts and omissions complained of herein;

F.      Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

G.      Ordering that the Individual Defendants and those under their supervision and control to refrain from further violations as are alleged herein and to implement corrective measures including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein which will rectify all such wrongs as have been committed, prevent their recurrence, and ensure compliance with SOX;

H.      Awarding pre-judgment and post-judgment interest as allowed by law;

I.      Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

J.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED this 17th day of March, 2021.

**LAW OFFICES OF MICHAEL G. HANLON, P.C.**

By: s/ Michael G. Hanlon

    **Michael G. Hanlon**, OSB No. 792550
101 SW Main Street, Suite 825
Portland, OR 97204
Telephone: (503) 228-9787
Facsimile:  (503) 224-4200
Email:    mgh@hanlonlaw.com

and

**David C. Katz**, (*pro hac vice application forthcoming*)
**Mark. D. Smilow**, (*pro hac vice application forthcoming*)
**Joshua M. Rubin**, (*pro hac vice application forthcoming*)
**WEISSLAW LLP**
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
Email:    dkatz@weisslawllp.com
        msmilow@weisslawllp.com
        jrubin@weisslawllp.com

*Attorneys for Plaintiff*